[Cite as *State v. Martin*, 2014-Ohio-875.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 13CA010356 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| ROBERT H. MARTIN | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 12CR086124 |

DECISION AND JOURNAL ENTRY

Dated: March 10, 2014

---

WHITMORE, Judge.

{¶1} Appellant, Robert Martin, appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I

{¶2} On September 27, 2012, Paul Allgood and his wife were in front of a high-rise apartment building on East Avenue in Elyria, Ohio. Allgood had arranged to meet Brandon Green there to collect money to deposit into Allgood's step-son's jail account. Green arrived in a car with Maurice Newell and Martin. Newell parked the car in the back parking lot, and Allgood approached the car to talk to Green. While Allgood was talking to Green, Martin jumped out of the car and shoved a gun into Allgood's neck. Martin then robbed Allgood of $180 cash, a cell phone, and a necklace. Martin got back into the car, and Newell drove away.

{¶3} Brandon Leety, a Time Warner Cable employee, was in the parking lot and noticed a man standing outside of a nearby car pointing a gun at a passenger in the back seat.

Leety then went inside the apartment building and asked the secretary to call the police. The police arrived on scene and interviewed Leety and Allgood. Allgood was then transported to the police station, where he gave written and oral statements.

{¶4} Martin was indicted on aggravated robbery, in violation of R.C. 2911.01(A)(1), a felony of the first degree, and robbery, in violation of R.C. 2911.02(A)(2), a felony of the second degree. A jury found Martin guilty on both counts. At sentencing, the court found that the two crimes were allied offenses of similar import and merged the robbery into the aggravated robbery. The court then sentenced Martin to four years in prison for aggravated robbery.

{¶5} Martin now appeals and raises two assignments of error for our review. To facilitate the analysis, we rearrange his assignments of error.

II

Assignment of Error Number Two

THERE WAS NOT SUFFICIENT EVIDENCE TO ESTABLISH PROOF BEYOND A REASONABLE DOUBT.

{¶6} In his second assignment of error, Martin argues that his convictions are not supported by sufficient evidence. We disagree.

{¶7} "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 23, quoting *State v. Slevin*, 9th Dist. Summit No. 25956, 2012-Ohio-2043, ¶ 15. "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a

light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶8} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶9} A person is guilty of aggravated robbery if he or she, in "committing a theft offense * * * [has] a deadly weapon on or about [his or her] person * * * and either display[s] the weapon[ or] brandish[es] it * * *." R.C. 2911.01(A)(1). A person is guilty of theft if he or she, with the purpose to deprive the owner of property, knowingly obtains or exerts control over the property without the consent of the owner. R.C. 2913.02(A)(1). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶10} A person is guilty of robbery if, in "committing a theft offense * * * [he or she] [i]nflict[s], attempt[s] to inflict, or threaten[s] to inflict physical harm on another * * *." R.C. 2911.02(A)(2).

{¶11} At trial, Allgood testified that he arranged to meet Green at a high-rise apartment building on East Avenue in Elyria. Allgood explained that he was collecting money to deposit into his step-son's jail account so that his step-son could purchase items from the commissary while incarcerated. According to Allgood, Green was friends with his step-son and wanted to contribute.

{¶12} Allgood testified that he was standing in front of the high-rise apartment building when a car pulled up. Allgood recognized the three men inside the car as Newell, Martin, and Green. Allgood explained that Newell was driving, Martin was sitting in the front passenger seat, a child was sitting in the back seat behind Newell, and Green was sitting behind Martin. Allgood testified that the car was blocking traffic so Newell pulled into the apartment's parking lot and Allgood followed on foot. When Allgood reached the car, Green moved over and told Allgood to get in. Allgood testified that he got into the back seat on the passenger's side, behind Martin.

{¶13} According to Allgood, he had a brief conversation with Green before removing $180 in cash from his pants' pocket. Allgood explained that Green wanted to contribute to his step-son's jail account, but wanted change for a $50. Allgood testified that as soon as he removed the cash from his pocket, Martin exited the car, opened the passenger's side rear door where Allgood was sitting, and shoved a gun into his neck. Martin then said, "[g]ive me my s***," snatched the money from Allgood's hand, grabbed his cell phone from the clip on the right side of his hip, and removed his necklace. Martin then ordered Allgood out of the car and told him to take off. Allgood testified that he was too scared to run, but did leave the scene quickly after Martin threatened him again with the gun.

{¶14} Viewing the evidence in a light most favorable to the State, a rational juror could have found that Martin knowingly took Allgood's cash, cell phone, and necklace without Allgood's permission and with the purpose to deprive Allgood of his property. *See* R.C. 2913.02(A)(1). Further, a rational juror could have found that Martin displayed a weapon and threatened to inflict physical harm while committing the theft offense. *See* R.C. 2911.01(A)(1)

and 2911.02(A)(2). Because there was sufficient evidence to support his convictions, Martin's second assignment of error is overruled.

Assignment of Error Number One

THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶15}** In his first assignment of error, Martin argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶16}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**{¶17}** Martin argues that Allgood was not a credible witness because of his criminal past and inconsistent statements regarding the details of the robbery.

**Criminal Past**

{¶18} At trial, Allgood testified about his criminal convictions, which included domestic violence, drug trafficking, theft, and nonsupport. Allgood admitted that while he did not have any felony convictions in the past five years, he was under indictment for breaking and entering. His convictions were discussed on both direct and cross-examination.

**Inconsistent Statements**

{¶19} Martin argues that Allgood gave inconsistent versions of the robbery in his written and oral statements to the police, testimony at the preliminary hearing, and testimony at trial. We discuss each statement in turn.

### a. Written Statement

{¶20} Allgood provided the following written statement to the police shortly after the robbery.

> I was standing with my wife and some friends, visiting and having fun. When a car pulled up with 3 people in it. Brandon Green, Masson and Bobby Martin was in the car. One of the passagers asked me about my step-son Dominique when Bobby Martin jumped out the car and pulled a 357 pistol on me and took my money, $180 cash, my cell phone and a $700 necklace. (Sic.)

{¶21} At trial, Allgood admitted that he mistakenly wrote 225 Eighth Street, instead of 222 Eighth Street, on the bottom of the statement as his home address. Allgood explained that he was still "shook" up from the robbery when he wrote his statement and does not know why he wrote the wrong address.

### b. Audio Statement

{¶22} In addition to a written statement, Allgood provided the police with a verbal statement of the incident shortly after the robbery. The recording of Allgood's statement is 8 minutes and 40 seconds long.

{¶23} Allgood said that he and his wife were out front of the high-rise apartment building visiting friends when a car pulled up and one of the passengers shouted Allgood's name. Allgood recognized the three men in the car as Newell, Martin, and Green. Newell was driving, Martin was in the front passenger seat, Green was sitting behind Martin, and a baby, in a car seat, was behind Newell. Allgood described the car as a foreign dark blue sports car. Allgood said the car had tinted windows, nice rims, and looked "racy."

{¶24} Allgood told the police that the car was blocking traffic so it pulled into the back parking lot of the apartment building and Allgood followed. Allgood said he was standing at the back passenger window talking to Green when Martin jumped out of the car, put a gun to Allgood's neck, and said, "mother f******, where's my s***." Allgood thought the gun was something like a .357 or .44. He described the gun as a long barrel revolver, not solid black, silver, or chrome, but "greyish" in color with a red mark on the sight.

{¶25} Allgood said that as soon as Martin pulled his gun, Green climbed over the front seat, exited the front passenger door, and fled. Green could not exit out of the back doors because the baby seat was blocking the driver's side and Allgood was blocking the passenger's side. Meanwhile, Newell was saying, "hey, hey, I got my baby in here." Martin then took Allgood's phone from the clip on his right hip, his necklace from around his neck, and $180 in cash from his right front pants' pocket. Allgood said Martin checked all of his pockets before telling him to leave the area. Allgood explained that he was scared to run away and did not leave until Martin again pointed the gun at him and told him to take off running. Allgood then quickly made his way back to the front of the apartment building, where he found Green. Allgood said Martin got back into the car and Newell drove out of the parking lot, heading toward Broad Street.

{¶26} Green told Allgood that he would try to get his property back and began walking up the street. Allgood said he followed Green for a while, but decided he did not want to confront Martin because he had a gun. At that point, Green's girlfriend pulled up in her car and Green got in. Allgood returned to the high-rise and spoke to the police officers that had arrived.

{¶27} After Allgood provided the police with his written and oral statement at the police station, he signed a complaint against Newell for aggravated robbery. At trial, Allgood testified that the police prepared the complaint and he just signed it. He did not discuss the complaint with the officers or request that the police charge Newell.

### c. **Preliminary Hearing**

{¶28} Approximately one month after the robbery, Allgood testified at a preliminary hearing. Allgood testified that on the evening of September 27, he and his wife walked up to the high-rise apartment building on East Avenue. Allgood stated that he had spoken to Green earlier and the two had arranged to meet there. He testified that a car pulled up with Newell, Martin, and Green inside. Allgood explained that Newell was driving, Martin was in the front passenger seat, Green was sitting behind Martin, and a baby was sitting behind Newell. Allgood testified that he was not sure what kind of car it was and could not recall its color. He said that it was a four door car, not a sports utility vehicle.

{¶29} He testified that the car parked in the back parking lot, behind the apartment building, and he approached the car alone. He then got in the back seat of the car next to Green. Allgood said that he was talking to Green about his step-son that was incarcerated and was trying to collect money to deposit into his jail account. The next thing Allgood knew, Martin exited the car, opened Allgood's door, and shoved a pistol into his neck. Allgood could not remember the caliber or color of the gun, but was pretty sure it was a revolver.

**{¶30}** Allgood testified that when Martin pulled out his gun Newell seemed genuinely surprised and concerned for his baby, who was in the car, and Green jumped out of the car and ran. Allgood said that Martin snatched $180 in cash from his hand, removed his cell phone from the clip on his right hip, and took his necklace from around his neck. Martin then told Allgood to get out of the car and run. Allgood testified that he exited the car and left the scene. Allgood said that he did not see where the car went, but he knows the car left the area.

### d. Trial

**{¶31}** A trial began on January 7, 2013, approximately three months after the robbery. At trial, Allgood testified that on September 27, 2012, he and his wife were out walking and stopped at various places to talk to family and friends. He had arranged to meet Green at the high-rise apartments because Green wanted to contribute to Allgood's step-son's jail account. Allgood testified that he was standing in front of the high-rise when a car pulled up. Allgood said he recognized the occupants as Newell, Martin, and Green. Allgood testified that Newell was driving, Martin was in the front passenger seat, a baby was directly behind Newell, and Green was behind Martin. Allgood explained that because the car was blocking traffic, it pulled around back and he followed on foot.

**{¶32}** When Allgood got to the parked car, Green slid over and Allgood got into the back seat on the passenger's side. Allgood testified that when he pulled money out of his pants' pocket to give Green change Martin suddenly jumped out of the car, opened the back door, and put a gun to Allgood's neck. Allgood said he did not know the "exact make and model" of the gun, but knew that it was a long barrel revolver. Allgood testified that when Martin drew his gun, Green jumped over the front seat, exited the car out of the front passenger door, and fled the

scene. Newell, meanwhile, looked surprised and expressed concern about his baby being in the car.

{¶33} Allgood stated that after Martin placed the gun to his neck, Martin snatched the $180 from his hand, a cell phone from a clip on his right hip, and removed his necklace from around his neck. Martin then ordered Allgood out of the car and told him to "[g]et the f*** up out of [t]here." Allgood testified that he did not leave until Martin pointed the gun at him again, and told him he had "better get the F up out of [t]here." Allgood then quickly returned to the front of the apartment building.

{¶34} Allgood testified that Green was at the front of the apartment building when he arrived. Allgood spoke to Green and told Green he wanted his property back. According to Allgood, Green was going to meet up with Martin to try to get Allgood's belongings returned. Allgood testified that Green began walking toward a meeting spot. Allgood followed Green for a while, but thought better of confronting a man with a gun and decided to turn around. When Allgood arrived back at the high-rise apartment building, the police were there. Allgood spoke with the officers on the scene and accompanied them to the police station where he gave his written and oral statements.

**Other Testimony at Trial**

{¶35} The State also called Brandon Leety as a witness. Leety, a Time Warner Cable employee, was at the high-rise apartment building to install service to one of the residents. He testified that he was parked in the back parking lot, backed into a parking space. Leety explained that while he was standing on the passenger's side of his van collecting his equipment, he heard shouting from a nearby car. He looked to his right and saw an individual leaning into the open rear passenger door and pointing a gun at the person in the back seat. Leety explained that the

car was directly across from him, facing the opposite direction. Leety thought the car was a Chrysler 300, and remembered that one of the taillights was out and covered by red tape. Leety further testified that he thought the car might have been green, but that he was not paying much attention to that detail. After seeing the gunman, Leety said he immediately locked his van and went into the apartment building where he asked the secretary to call the police.

{¶36} Leety testified that he did not see the faces of any of the people involved, but provided a description of their physique. Leety said he thought the driver was female, but admitted that the driver was facing the opposite direction and could have been a male with long hair. Leety also noticed a baby was in the car.

{¶37} The defense called Jacqueline Martin, Martin's mother, to testify. According to Jacqueline, Allgood asked her to pay for "a watch, a phone, a necklace, and $180 that had supposedly been taken from him." In exchange, Jacqueline understood that Allgood would drop the charges against Martin. Allgood testified that he never offered to drop the charges if his property was returned.

{¶38} Jacqueline testified that she has prior convictions for assault on a police officer, receiving stolen property, forgery, possession of cocaine, and theft. She further testified that she is bipolar and schizophrenic.

**Conclusion**

{¶39} A review of the evidence does show some inconsistencies between Allgood's various accounts, e.g., Allgood was standing outside of the car when Martin went through his pockets and retrieved his cash versus Allgood was sitting inside the car when Martin snatched the cash from his hand. However, the inconsistencies were thoroughly vetted on cross-examination. Allgood never wavered in his statement that Martin, a man he knew, pointed a gun

at him and stole $180 in cash, his cell phone, and necklace. Additionally, Allgood's criminal history was fully disclosed to the jury. "[C]redibility determinations are primarily for the trier of fact." *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 18. Despite the inconsistencies between Allgood's statements, this is not the exceptional case where the jury lost its way. *See State v. Harris*, 9th Dist. Summit No. 25364, 2011-Ohio-4066, ¶ 31.

{¶40} Martin's first assignment of error is overruled.

## III

{¶41} Martin's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

BELFANCE, P. J.
CARR, J.
CONCUR.


APPEARANCES:

KENNETH N. ORTNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.